UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE


SAMANTHA MILBY                                                    PLAINTIFF


v.                                        CIVIL ACTION NO. 3:13-CV-00487-CRS


LIBERTY LIFE ASSURANCE                                           DEFENDANT
COMPANY OF BOSTON


**MEMORANDUM OPINION**

This matter is before the Court on three motions.  Plaintiff Samantha Milby filed a

motion to remand (DN 8) and a motion for a hearing and oral argument (DN 43).  Defendant

Liberty Life Assurance Co. of Boston ("Liberty") submitted a motion for leave to file a surreply

(DN 39).  For the following reasons, the Court will deny Plaintiff's motion to remand (DN 8)

and her motion for a hearing and oral argument[1] (DN 43), and it will grant Liberty's motion for

leave to file a surreply[2] (DN 39).

I.      **BACKGROUND**

University Medical Center, Inc., ("UMC") employed Plaintiff as a registered nurse at

University of Louisville Hospital ("U of L Hospital").  (Compl., DN 1-1, ¶ 9.)  Through that

employment, Plaintiff obtained coverage under a long-term disability ("LTD") insurance policy,

---

[1] Plaintiff moves for a hearing and oral argument on her pending motion to remand (DN 43).  The Court allowed the parties adequate opportunity to thoroughly brief the motion to remand.  In light of that extensive briefing, a hearing or oral argument will provide no additional aid to the Court.  Accordingly, Plaintiff's motion for a hearing and oral argument (DN 43) will be denied.

[2] Liberty requests leave to file a surreply (DN 39).  While Plaintiff objects to the motion, Liberty's surreply will assist the Court in weighing the new authority cited in Plaintiff's most recent reply.  The Court therefore will grant Liberty's motion.  The Court considered Liberty's surreply in ruling on Plaintiff's motion to remand (DN 8).

which provided monthly benefits to eligible employees.  (Compl., DN 1-1, ¶¶ 11–12.)  Liberty

issued and underwrote that LTD policy.  (Compl., DN 1-1, ¶ 11.)

On September 10, 2011, Plaintiff began receiving LTD benefits under the policy.

(Compl., DN 1-1, ¶ 14.)  But, after an eligibility review, Liberty determined that Plaintiff was no

longer disabled within the terms of the policy.  (Compl., DN 1-1, ¶¶ 14–15.)  On February 21,

2013, Liberty terminated her LTD benefits.  (Compl., DN 1-1. ¶ 15.)

On April 17, 2013, Plaintiff filed this lawsuit in Jefferson County Circuit Court to

challenge Liberty's denial of LTD benefits.  (Compl., DN 1-1.)  On its face, Plaintiff's

Complaint alleges only state law claims, including breach of contract, common law and statutory

bad faith, and negligence per se based on violations of Kentucky's medical licensing statutes.

(Compl., DN 1-1, Cls. for Relief A–E.)

On May 13, 2013, Liberty removed the case to this Court.  (Notice of Removal, DN 1.)

Liberty contends that the Employee Retirement Income Security Act of 1974 ("ERISA"), 29

U.S.C. § 1001 *et seq.*, completely preempts Plaintiff's state law claims, creating a federal

question over which subject matter jurisdiction may be exercised.[3]  Plaintiff, in turn, argues that

the LTD policy is exempt from ERISA, and she moves to remand this case to state court for lack

of subject matter jurisdiction.  (Pl.'s Mot. to Remand, DN 8.)

The nature of UMC's relationship with the Commonwealth of Kentucky arose as the

crucial issue in resolving this jurisdictional matter.  Therefore, the Court will briefly set out the

facts surrounding UMC's origins and its connections to the state.  In 1995, the University of

Louisville ("U of L")—a state institution, *see* KRS 164.810 *et seq.*—issued a request for

---

[3] In addition, Liberty asserts that the Court possesses subject matter jurisdiction over this case based on diversity of citizenship.  Plaintiff, however, argues that Liberty did not meet its burden of establishing the requisite amount in controversy.  As explained below, the Court concludes that federal question jurisdiction is present.  The Court therefore will not address diversity jurisdiction.

proposals for an organization to assume operation and management of U of L Hospital and related facilities, which served as vital teaching grounds for U of L's medical school. (Req. for Proposal, DN 11-7.) In response, Henry C. Wagner, President and Chief Executive Officer ("CEO") of Jewish Hospital and Healthcare Services ("Jewish"), and Stephen A. Williams, President and CEO of Alliant Health System, Inc. ("Alliant"), formed UMC as a private, nonprofit corporation. (Arts. of Incorp., DN 11-2, art. 5.) Wagner and Williams incorporated UMC pursuant to Kentucky's general nonprofit corporation statutes, KRS 273.161 *et seq.* (Arts. of Incorp., DN 11-2, art. 2, § B.) UMC's original bylaws provided for an eleven-member Board of Directors ("Board"), consisting of three members appointed by Alliant, three members appointed by Jewish, and five members appointed by U of L. (Original Bylaws, DN 11-4, art. III, § 3.01.)

U of L ultimately accepted UMC's proposal. In February 1996, UMC began overseeing U of L Hospital in accordance with two major contracts. (Taylor Aff., DN 11-8, ¶ 2.) First, UMC leased U of L Hospital from U of L and Kentucky, which owns the relevant property for U of L's use and benefit. (Lease Agreement, DN 11-6.) Second, an affiliation agreement between UMC, U of L, and Kentucky established guidelines for the operation and management of the facilities. (*See* Req. for Proposal, DN 11-7; Taylor Aff., DN 11-8, ¶ 2.)

In 2007, Alliant, which had become Norton Healthcare, Inc. ("Norton"), and Jewish withdrew from UMC. The withdrawal of those entities necessitated contractual changes and changes within UMC itself. As a result, UMC entered into a new affiliation agreement with U of L and Kentucky. (Affiliation Agreement, DN 11-5.) On January 29, 2008, UMC's Board also adopted a set of amended bylaws. (Am. Bylaws, DN 11-3.) The Court will discuss those amended bylaws in detail throughout its legal analysis. For now, it suffices to say that the

amended bylaws expanded the role played by U of L, or individuals associated with U of L, in UMC's governance structure.

Though UMC and U of L hold close ties, UMC displays characteristics of an independent, private entity. UMC keeps its budget and assets separate from U of L. (Taylor Aff., DN 11-8, ¶ 4.) UMC's employees are not considered employees of U of L. (Taylor Aff., DN 11-8, ¶ 5.) The employees of UMC are not placed on U of L's payroll, nor do they have access to public employee benefits. (Taylor Aff., DN 11-8, ¶ 5.) In fact, UMC negotiates and maintains its own employee benefit plans, including the LTD policy at issue here. (Taylor Aff., DN 11-8, ¶ 9.)

In February 2013, UMC ceased overall operation and management of U of L Hospital. (Taylor Aff., DN 11-8, ¶ 2.) UMC now runs only the Center for Women and Infants. (Taylor Aff., DN 11-8, ¶ 2.) A different entity, which is not a party to this litigation, assumed responsibility for the remainder of U of L Hospital. (Taylor Aff., DN 11-8, ¶ 2.)

## II.    STANDARD

When considering a motion to remand, the Court looks to "whether the action was properly removed in the first place." *Ahearn v. Charter Twp. of Bloomfield*, 100 F.3d 451, 453 (6th Cir. 1996). The general removal statute allows the defendant or defendants to remove a civil action from state court to federal district court when that action could have been brought originally in federal district court. 28 U.S.C. § 1441(a). But, as frequently noted, the federal district courts are "courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552, 125 S. Ct. 2611, 162 L. Ed. 2d 502 (2005) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994)) (internal quotation marks omitted).

Therefore, if the Court lacks original subject matter jurisdiction over a removed action, it must

remand that action to state court. 28 U.S.C. § 1447(c). "All doubts as to the propriety of

removal are resolved in favor of remand." *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 493 (6th

Cir. 1999).

Liberty argues that the Court holds subject matter jurisdiction over this case based on the

presence of a federal question. Federal question jurisdiction exists in "all civil actions arising

under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "Ordinarily,

determining whether a particular case arises under federal law turns on the 'well-pleaded

complaint' rule." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207, 124 S. Ct. 2488, 159 L. Ed. 2d

312 (2004) (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S.

1, 9–10, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983)). The well-pleaded complaint rule recognizes

the plaintiff as the master of the complaint. *Alexander v. Elec. Data Sys. Corp.*, 13 F.3d 940, 943

(6th Cir. 1994). When the wrong asserted could be addressed under state or federal law, the

plaintiff possesses the right to choose the law upon which he will rely. *Id.* The Court may

exercise federal question jurisdiction only in those cases where "a well-pleaded complaint

establishes either that federal law creates the cause of action or that the plaintiff's right to relief

necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd.*,

463 U.S. at 27–28. Hence, the mere existence of a federal defense to the plaintiff's state law

claim is insufficient to support federal question jurisdiction. *Id.* at 10.

 "One corollary of the well-pleaded complaint rule . . . is that Congress may so

completely pre-empt a particular area that any civil complaint raising this select group of claims

is necessarily federal in character." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–64, 107 S.

Ct. 1542, 95 L. Ed. 2d 55 (1987). When a federal statute completely preempts a state law cause

of action, a claim within the scope of that cause of action, even if pleaded in state law terms, is in

reality based on federal law and may be removed. *Davila*, 542 U.S. at 207–08. ERISA's civil

enforcement provision, 29 U.S.C. § 1132(a)(1)(B), is one of those federal statutes "with such

'extraordinary pre-emptive power' that it 'converts an ordinary state common law complaint into

one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Id.* at 209 (quoting

*Metro. Life*, 481 U.S. at 65). Thus, any state law cause of action that "duplicates, supplements,

or supplants" the exclusive civil enforcement mechanism in § 1132(a)(1)(B) of ERISA is

completely preempted and subject to removal. *Id.*

## III.   DISCUSSION

In deciding whether complete preemption applies, the Court must examine the nature of

Plaintiff's state law claims alongside the potential actions afforded by § 1132(a)(1)(B). ERISA's

§ 1132(a)(1)(B) provides as follows:

> A civil action may be brought . . . by a participant or beneficiary . . . to recover
> benefits due to him under the terms of his plan, to enforce his rights under the
> terms of the plan, or to clarify his rights to future benefits under the terms of the
> plan.

29 U.S.C. § 1132(a)(1)(B). The parties do not dispute that the LTD policy at issue falls within

ERISA's definition of an "employee welfare benefit plan,"[4] or a "plan"[5] as identified in

§ 1132(a)(1)(B). It is also undisputed that Plaintiff is a "participant"[6] in that LTD policy.

---

[4] 29 U.S.C. § 1002(1) ("The terms 'employee welfare benefit plan' and 'welfare plan' mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).").

[5] 29 U.S.C. § 1002(3) ("The term 'employee benefit plan' or 'plan' means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan.").

[6] 29 U.S.C. § 1002(7) ("The term 'participant' means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any

Rather, the critical point of contention concerns the general scope of ERISA's coverage and, by implication, whether any claim under § 1132(a)(1)(B) would be available in the first place.  Plaintiff argues that the LTD policy offered by UMC is excluded from ERISA's coverage as a "governmental plan."  Though a plan qualifies as an employee benefits plan under ERISA, that plan may still evade ERISA's broad coverage if it falls within a statutory exemption.  *Id.* § 1003(b).  ERISA specifically exempts "any employee benefit plan if . . . such plan is a governmental plan."  *Id.* § 1003(b)(1).  ERISA defines the term "governmental plan" as "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of the foregoing."  *Id.* § 1002(32).  Here, Plaintiff contends that UMC is a "political subdivision" or "agency or instrumentality" of Kentucky because UMC manages health care facilities associated with a state institution—U of L.

ERISA is a federal statute, and absent clear legislative intent to the contrary, its terms must be interpreted and applied by reference to federal law.  *Shannon v. Shannon*, 965 F.2d 542, 546 (7th Cir. 1992); *Rose v. Long Island R.R. Pension Plan*, 828 F.2d 910, 915 (2d Cir. 1987).  Congress enacted ERISA "to remedy long-standing abuses and deficiencies in the private pension system," such as "inadequate vesting provisions, insufficient assets to assure payment of future benefit obligations, and premature termination of under-funded benefit plans."  *Rose*, 828 F.2d at 913.  ERISA exempts governmental plans for several reasons.  First, public plans generally contain more generous vesting provisions than private plans.  *Id.* at 914.  Second, the fact that government entities may use their taxing powers to fulfill their obligations to employees alleviates the need for minimum funding standards and plan termination insurance.  *Id.*  Finally,

---

type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.").

ERISA's minimum funding and other standards might impose unacceptable costs on government entities. *Id.*

The Sixth Circuit has not interpreted the terms "political subdivision" or "agency or instrumentality" in the context of ERISA's governmental plan exemption. Other courts use a variety of approaches in applying that statutory language. The Second Circuit, Third Circuit, and Seventh Circuit interpret "political subdivision" according to standard used in *NLRB v. Natural Gas Utility District of Hawkins County*, 402 U.S. 600, 604–05, 91 S. Ct. 1746, 29 L. Ed. 2d 206 (1971), which interpreted the same term in the National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(2). *Koval v. Wash. Cnty. Redevelopment Auth.*, 574 F.3d 238, 241 (3d Cir. 2009); *Shannon*, 965 F.2d at 547; *Rose*, 828 F.2d at 915–16. Two distinct approaches have arisen for interpreting "agency or instrumentality."[7] The Second Circuit applies the terms "agency or instrumentality" according to a multi-factor test announced in the rulings of the Internal Revenue Service ("IRS"). *Rose*, 828 F.2d at 917–18. The D.C. Circuit, on the other hand, focuses predominantly on the nature of the employment relationship in deciding whether a particular employer is a government "agency or instrumentality" for purposes of ERISA. *Alley v. Resolution Trust Corp.*, 984 F.2d 1201, 1206–07 (D.C. Cir. 1993). After reviewing each of the foregoing standards, the Court concludes that UMC is not a political subdivision, agency, or instrumentality of Kentucky under ERISA's governmental plan exemption.

A.     *Hawkins County* Test

To start, UMC is not a political subdivision under the *Hawkins County* test. The *Hawkins County* test limits political subdivisions "to entities that are either (1) created directly by the

---

[7] The Seventh Circuit also used the *Hawkins County* test in its application of the terms "agency or instrumentality." *Shannon*, 965 F.2d at 548. The Court will not adopt that same approach here. Unlike "political subdivision," the terms "agency or instrumentality" do not appear in the relevant provision of the NLRA for which the *Hawkins County* test was devised. *See* 29 U.S.C. § 152(2).

state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate." 402 U.S. at 604–05 (internal quotation marks omitted).  The first portion of the *Hawkins County* test is not satisfied under the present facts.  Neither Kentucky nor its arm, U of L, directly created UMC.  No special act of the legislature or a public official brought UMC into existence. *See Jefferson Cnty. Cmty. Ctr. for Developmental Disabilities, Inc. v. NLRB*, 732 F.2d 122, 124 (10th Cir. 1984), *overruled on other grounds by Aramark Corp. v. NLRB*, 179 F.3d 872, 882 (10th Cir. 1999); *Truman Med. Ctr., Inc. v. NLRB*, 641 F.2d 570, 572 (8th Cir. 1981).  Two private individuals, acting as incorporators, created UMC by following the general procedures for forming a nonprofit corporation specified in Kentucky's statutes.  *Ky. River Cmty. Care, Inc. v. NLRB*, 193 F.3d 444, 450 (6th Cir. 1999); *Shannon*, 965 F.2d at 551; *Jefferson Cnty. Cmty. Ctr.*, 732 F.2d at 124.  UMC's incorporators, Wagner and Williams, were not affiliated with the state as officials or employees.  They served as executives for private companies specializing in health care.  (Arts. of Incorp., DN 11-2, art. 5.)

In addition, UMC operated and managed U of L Hospital and now oversees only the Center for Women and Infants pursuant to a series of contracts between U of L, Kentucky, and itself, not pursuant to any statutory duty.  *See Truman Med. Ctr.*, 641 F.2d at 572.  Those contracts did not transform UMC from a private, nonprofit corporation into a state-created department or administrative arm of the government.  *Jefferson Cnty. Cmty. Ctr.*, 732 F.2d at 125; *Truman Med. Ctr.*, 641 F.2d at 572.  "Were the law otherwise, it would seem impossible or nearly so for a government to divest itself of any of its operations; there would be no route to privatization, but there is."  *Shannon*, 965 F.2d at 551.

Finally, UMC does not bear sufficient indicia of sovereignty to be deemed a political subdivision of Kentucky. *See Rose*, 828 F.2d at 916–17; *Truman Med. Ctr.*, 641 F.2d at 572–73; *see also Hawkins Cnty.*, 402 U.S. at 606–09. No statute expressly recognizes UMC as part of the government of Kentucky, and UMC lacks traditional sovereign powers, such as eminent domain and authority to tax. The employees of UMC do not receive public employee benefits. (Taylor Aff., DN 11-8, ¶ 5.) While UMC does claim federal tax-exempt status under 26 U.S.C. § 501(c)(3), such status is common among private, nonprofit corporations. (*See* Arts. of Incorp., DN 11-2, art. 2, § B.) Plaintiff, however, does identify one mark of sovereignty—UMC's records are subject to public disclosure under the Kentucky Open Records Act, KRS 61.870 *et seq. Univ. Med. Ctr., Inc. v. ACLU*, — S.W.3d —, No. 2013-CA-000446-MR, 2014 WL 5369340, at *8 (Ky. App. Oct. 3, 2014) (not final). But the fact that UMC must keep open records as a matter of state law, by itself, is insufficient to show that Kentucky directly created UMC for purposes of federal law under ERISA. *See Pridgen v. Tex. Mut. Ins. Co.*, No. 3:04-CV-0189-G, 2004 WL 2070956, at *6 (N.D. Tex. Sept. 15, 2004). The Court concludes that UMC is not a political subdivision of Kentucky under the first part of the *Hawkins County* test.

Turning to the second portion of the *Hawkins County* test, the Court must look to whether UMC is administered by individuals who are responsible to public officials or to the general electorate. 402 U.S. at 604–05. An entity satisfies this standard only when a majority of its board of directors is directly responsible to public officials or the general electorate. *FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 777 (6th Cir. 2002). Here, Plaintiff argues that U of L officials control the Board of UMC under the corporation's amended bylaws.

UMC's amended bylaws provide that the Board must consist of seventeen voting members. (Am. Bylaws, DN 11-3, art. IV, § 4.01.) The President of U of L, or his designee,

serves ex officio as Chairman of the Board and a voting member.  (Am. Bylaws, DN 11-3, art. IV, § 4.02(a).)  The remaining Board members are divided into two groups—University Directors and Community Directors.  (Am. Bylaws, DN 11-3, art. IV, § 4.02(a).)  The Chairman directly appoints a minimum of four and a maximum of seven University Directors, which must include four ex-officio members designated based on their positions at U of L.  (Am. Bylaws, DN 11-3, art. IV, § 4.02(a).)  The Community Directors consist of a minimum of nine and a maximum of twelve community leaders with a demonstrated interest in health care issues.  (Am. Bylaws, DN 11-3, art. IV, § 4.02(a).)  None of the Community Directors may be formally associated with U of L or one of UMC's competitors.  (Am. Bylaws, DN 11-3, art. IV, § 4.02(a).)  The term of office for the Chairman is coextensive with his term as U of L's President.  (Am. Bylaws, DN 11-3, art. IV, § 4.02(b).)  The remaining members of the Board serve three-year terms.  (Am. Bylaws, DN 11-3, art. IV, § 4.02(b).)

According to the amended bylaws, the Community Directors hold a crucial position in the Board's structure.  The Board may act only through a majority vote of a quorum.  (Am. Bylaws, DN 11-3, art. IV, §§ 4.10–4.11.)  To constitute a quorum, a majority of the Board's voting members must be present, and a majority of those members present must be Community Directors.  (Am. Bylaws, DN 11-3, art. IV, § 4.10.)  Therefore, a controlling majority of Community Directors must be on hand for the Board to take action.

U of L nevertheless enjoys substantial influence over the nomination of Community Directors.  Though the Board elects each Community Director, a candidate may stand for election only after he secures the recommendation of the Nominating Committee.  (Am. Bylaws, DN 11-3, art. VI, § 6.03.)  The Nominating Committee is led by the Chairman of the Board and also includes one University Director and two Community Directors.  (Am. Bylaws, DN 11-3,

art. VI, § 6.03.)  U of L's President, acting as the Chairman, appoints the three other members of the Nominating Committee. (Am. Bylaws, DN 11-3, art. VI, §§ 6.01(A), 6.03.)

In asserting that UMC falls within ERISA's governmental plan exemption, Plaintiff relies heavily on UMC's status as a "public agency" under the Kentucky Open Records Act. *Univ. Med. Ctr.*, 2014 WL 5369340, at *7–8.  In *University Medical Center*, the Kentucky Court of Appeals reasoned that, given the authority of U of L's President to select the members of the Nominating Committee, "[i]t is highly unlikely [he] would allow someone unfavorable to U of L to be nominated as a Community Director." *Id.* at *7.  The court then construed U of L's clout in the nomination process as equivalent to U of L appointing a majority of UMC's Board in keeping with one of the statute's definitions of "public agency." *Id.* at *7–8; *see* KRS 61.870(1)(i).  Plaintiff argues that this analysis and holding compel the conclusion that UMC's LTD policy is a governmental plan exempt from ERISA.

But the question before the Court is not so easily resolved.  A state court's reading of a state open records statute does not bind this Court as it interprets ERISA, a federal statute regulating employee benefit plans.[8]  *See Shannon*, 965 F.2d at 546; *Rose*, 828 F.2d at 915. Beyond their distinct origins and contexts, the standards used to apply the two statutes differ. Under the Kentucky Open Records Act, UMC is considered a "public agency" because "the majority of its governing body is appointed by" U of L.  KRS 61.870(1)(i); *Univ. Med. Ctr.*, 2014 WL 5369340, at *7–8.  That definition is construed broadly to encompass influence similar to an express appointment power. *See Univ. Med. Ctr.*, 2014 WL 5369340, at *7–8.  In contrast, the governmental plan exemption is a narrow exception to ERISA's otherwise expansive coverage.  29 U.S.C. § 1003(b)(1).  In applying that exemption, the Court must ask, among other

---

[8] In the context of other federal claims, UMC has been found to be a private entity.  For example, the Sixth Circuit held that UMC was not a state actor for purposes of a free speech claim under the federal Constitution. *Mitchell v. Univ. Med. Ctr., Inc.*, No. 10-5979, 2011 U.S. App. LEXIS 26546, at *9–10 (6th Cir. Aug. 10, 2011).

inquiries, whether a majority of UMC's Board is directly responsible to U of L officials. *FiveCAP*, 294 F.3d at 777.

The Court hesitates to conclude that the influence of U of L's President over the nomination of Community Directors amounts to a majority of UMC's Board being appointed by a public official. Any candidate for Community Director must still be elected by the Board as a whole. (Am. Bylaws, DN 11-3, art. VI, § 6.03.) Fortunately, the Court need not rely on the issue of appointment alone. Courts employing the second portion of the *Hawkins County* test give great weight to the ability of a public official or the general electorate to remove an offending director. *Skills Dev. Servs., Inc. v. Donovan*, 728 F.2d 294, 300 (6th Cir. 1984); *N. Ohio Chapter of Associated Builders & Contractors, Inc. v. Gateway Econ. Dev. Corp. of Greater Cleveland*, No. 1:92 CV 0649, 1992 WL 119375, at \*13 (N.D. Ohio May 12, 1992). The power to remove, of course, is the power to discipline. *Skills Dev.*, 728 F.2d at 300.

Neither U of L's President nor any other U of L official possesses independent authority to remove the members of UMC's Board. UMC's amended bylaws vest the removal power in the Board itself. (Am. Bylaws, DN 11-3, art. IV, § 4.04.) Any Board member, excluding the Chairman and ex-officio members, may be removed from office at any time, with or without cause. (Am. Bylaws, DN 11-3, art. IV, § 4.04.) However, such removal requires a majority vote of both University Directors and Community Directors, voting by class. (Am. Bylaws, DN 11-3, art. IV, § 4.04.) Once appointed or elected, University Directors who do not serve ex officio and all Community Directors may govern UMC without fear of being removed at U of L's sole discretion. Those Board members may be removed only when their peers agree that the action is appropriate. U of L officials do not enjoy the sort of internal control necessary to conclude that a majority of UMC's Board is responsible to them.

-13-

Plaintiff's argument is further undermined by the fact that the composition of UMC's Board is established not by statute but by the corporate bylaws alone. *Pikeville United Methodist Hosp. of Ky., Inc. v. United Steelworkers of Am., AFL-CIO-CLC*, 109 F.3d 1146, 1151 (6th Cir. 1997); *Jefferson Cnty. Cmty. Ctr.*, 732 F.2d at 125 n.3; *Crestline Mem'l Hosp. Ass'n v. NLRB*, 668 F.2d 243, 245 (6th Cir. 1982). The decision to include U of L in the activities of UMC's Board is entirely voluntary and subject to change. *Crestline*, 668 F.2d at 245. UMC's Board may amend the bylaws through a majority vote of both University Directors and Community Directors, voting by class. (Am. Bylaws, DN 11-3, art. XV.) If UMC's Board is in any way accountable to U of L officials, it is "so accountable by choice rather than by law." *Jefferson Cnty. Cmty. Ctr.*, 732 F.2d at 125 n.3. That arrangement does not make a majority of UMC's Board responsible to U of L officials. Accordingly, the second portion of the *Hawkins County* test is also unsatisfied. For purposes of ERISA's governmental plan exemption, UMC is not a political subdivision of Kentucky.

## B.    IRS Factors

Next, UMC is not an agency or instrumentality of Kentucky according to the multi-factor test created by the IRS. ERISA does not define the terms "agency or instrumentality," and no regulations interpret those terms in ERISA's governmental plan exemption. Therefore, courts often look for guidance from the IRS's interpretation of "agency or instrumentality" in 26 U.S.C. § 414(d). *Rose*, 828 F.2d at 917–18; *Pridgen*, 2004 WL 2070956, at *3; *Dickerson v. Alexander Hamilton Life Ins. Co. of Am.*, 130 F. Supp. 2d 1271, 1274–75 (N.D. Ala. 2001). The definition of "governmental plan" in 26 U.S.C. § 414(d) is nearly identical to the one in 29 U.S.C. § 1002(32). "Because the IRS is one of the agencies charged with administering ERISA, its interpretations of the statute are entitled to great deference." *Rose*, 828 F.2d at 918.

-14-

The *Rose* court applied the factors listed in Revenue Ruling 57-128, 1957-1 C.B. 311.[9]

828 F.2d at 918.  Following *Rose*, the IRS refined its factors in Revenue Ruling 89-49, 1989-1

C.B. 117.  *See Pridgen*, 2004 WL 2070956, at *5–6.  Revenue Ruling 89-49 states,

> A plan will not be considered a governmental plan merely because the sponsoring organization has a relationship with a governmental unit or some quasi-governmental power.  One of the most important factors to be considered in determining whether an organization is an agency or instrumentality of the United States or any state or political subdivision is the degree of control that the federal or state government has over the organization's everyday operations.   Other factors include:  (1) whether there is specific legislation creating the organization; (2) the source of funds for the organization; (3) the manner in which the organization's trustees or operating board are selected; and (4) whether the applicable governmental unit considers the employees of the organization to be employees of the applicable governmental unit.  Although all of the above factors are considered in determining whether an organization is an agency of a government, the mere satisfaction of one or all of the factors is not necessarily determinative.

Rev. Rul. 89-49, 1989-1 C.B. 117.  The factors outlined in Revenue Ruling 57-128 and Revenue

Ruling 89-49 are quite similar and compel the same result here.  For the sake of efficiency, the

Court will focus its discussion on the factors more recently articulated by the IRS in Revenue

Ruling 89-49.

After careful consideration, the Court concludes that UMC is not an agency or

instrumentality of Kentucky under the IRS factors.  First, U of L does not control the everyday

operations of UMC.  Responsibility for UMC's day-to-day operations, including matters related

to human resources, information technology, accounting, marketing, and business development,

rests with the Board and the corporate officers.  (Arts. of Incorp., DN 11-2, art. 6; Am. Bylaws,

---

[9] In Revenue Ruling 57-128, 1957-1 C.B. 311, the IRS set forth the following factors to be considered in determining whether an entity is an agency or instrumentality of the government:

> (1) whether it is used for a governmental purpose and performs a governmental function; (2) whether performance of its function is on behalf of one or more states or political subdivisions; (3) whether there are any private interests involved, or whether the states or political subdivisions involved have the powers and interests of an owner; (4) whether control and supervision of the organization is vested in public authority or authorities; (5) if express or implied statutory or other authority is necessary for the creation and/or use of such an instrumentality, and whether such authority exists; and (6) the degree of financial autonomy and the source of its operating expenses.

-15-

DN 11-3, art. IV, § 4.01, art. VIII; Taylor Aff., DN 11-8, ¶¶ 6–8.)  Second, no specific legislation

created UMC.  Two private individuals formed UMC as a nonprofit corporation.  (Arts. of

Incorp., DN 11-2, art. 5.)  Third, UMC maintains a financial separation from U of L.  UMC sets

its own budget and holds its assets as an independent entity.  (Taylor Aff., DN 11-8, ¶ 4.)  In

operating U of L Hospital, UMC was entitled to all revenues and liable for the due payment of

expenses.  (Affiliation Agreement, DN 11-5, § 11.1.)  UMC paid the operating expenses of

U of L Hospital from its revenues, without receiving a management fee from U of L.  (Affiliation

Agreement, DN 11-5, § 11.2.1.)  UMC, by contract, agreed to either reinvested surplus cash

flow—meaning net cash remaining after customary operating, investing, and financing

activities—into U of L Hospital or distributed the surplus to U of L for enhancement of its health

care programs and facilities.  (Affiliation Agreement, DN 11-5, §§ 11.1, 11.4.)  UMC bore

responsibility for all losses resulting from the operation of U of L Hospital.  (Affiliation

Agreement, DN 11-5, § 11.2.3.)  Fourth, though U of L holds some influence in the selection of

UMC's Board members, U of L lacks the removal power to control and discipline those

members once they are appointed or elected.  (Am. Bylaws, DN 11-3, art. IV, § 4.04.)  Fifth,

UMC's employees are not considered employees of U of L, and UMC's employees are not

entitled to public employee benefits.  (Taylor Aff., DN 11-8, ¶ 5.)  For those reasons, the IRS

factors demonstrate that UMC is not an agency or instrumentality of Kentucky.

### C.    Employment-Relationship Test

Finally, UMC is not an agency or instrumentality of Kentucky under the employment-

relationship test.  The question here is whether UMC, in its employment relationships—"the area

most relevant for ERISA purposes"—functions like a government agency or a private

enterprise.[10]  *Alley*, 984 F.2d at 1206.  The employment-relationship test draws on the

assumption underlying the governmental plan exemption that public employees exempted from

ERISA would in fact be covered by "some distinctively 'public' employee benefit scheme."  *Id.*

The governmental plan exemption was not meant "to reach an entity that relates to its employees

as would a private business—an entity whose employees are not subject to laws governing public

employees generally."  *Id.*

Measured by that test, UMC clearly functions as a private enterprise in relating to its

employees.  Despite close ties to U of L, UMC retains its own distinct set of employees.  (Taylor

Aff., DN 11-8, ¶ 5.)  As previously noted, UMC's employees are not considered employees of

U of L, nor are they placed on U of L's payroll.  (Taylor Aff., DN 11-8, ¶ 5.)  Most importantly,

UMC's employees do not have access to any public employee benefit scheme.  (Taylor Aff.,

DN 11-8, ¶ 5.)  UMC negotiates and maintains its own employee benefit plans, including the

LTD policy at issue here.  (Taylor Aff., DN 11-8, ¶ 9.)  Under the employment-relationship test,

UMC does not meet the definition of an agency or instrumentality of Kentucky.

### D.      Claims Preempted by § 1132(a)(1)(B)

According to each potential standard, UMC does not qualify as a political subdivision,

agency, or instrumentality of Kentucky within the terms of the governmental plan exemption.

ERISA covers the LTD policy offered by UMC and subjects it to civil enforcement through

§ 1132(a)(1)(B).  Thus, the Court must determine which, if any, of Plaintiff's state law claims is

completely preempted by § 1132(a)(1)(B).

---

[10] The D.C. Circuit noted that the employment-relationship test is most helpful in assessing an entity's affiliation with the federal government.  *Alley*, 984 F.2d at 1205 n.11.  When a state government is involved, a test "focusing broadly on the extent of governmental contacts," such as the *Hawkins County* test or IRS factors, may be more appropriate to safeguard the values of federalism.  *Id.*  Here, all of those tests point to the conclusion that the governmental plan exemption does not apply to UMC.

A claim is within the scope of § 1132(a)(1)(B) for purposes of complete preemption if two requirements are satisfied:  "(1) the plaintiff complains about the denial of benefits to which he is entitled 'only because of the terms of an ERISA-regulated employee benefit plan'; and (2) the plaintiff does not allege the violation of any 'legal duty (state or federal) independent of ERISA or the plan terms[.]'"  *Gardner v. Heartland Indus. Partners*, 715 F.3d 609, 613 (6th Cir. 2013) (quoting *Davila*, 542 U.S. at 210).  Here, the recent decisions of this Court make clear that § 1132(a)(1)(B) completely preempts all of Plaintiff's purported state law claims.  *See Hanshaw v. Life Ins. Co. of N. Am.*, No. 3:14-CV-00216-JHM, 2014 WL 5439253, at *5–6 (W.D. Ky. Oct. 24, 2014); *Hogan v. Jacobson*, No. 3:12CV-820, 2013 WL 5425303, at *4 (W.D. Ky. Sept. 26, 2013).

First, Plaintiff's claims, while framed in state law terms, all complain of the denial of LTD benefits to which she is supposedly entitled only by reason of an ERISA-regulated plan.  *See Hanshaw*, 2014 WL 5439253, at *5.  Liberty's sole connection to Plaintiff is its role as issuer and underwriter of the LTD policy.  Moreover, Liberty's review and subsequent termination of the LTD benefits make up the alleged wrongful conduct underlying each of Plaintiff's claims.

Second, Plaintiff fails to allege a violation of any legal duty independent of ERISA or the terms of the LTD policy.  *See id.* at *5–6.  Plaintiff's claim for breach of contract obviously cannot arise independent of ERISA or the terms of the LTD policy.  *Id.* at *5.  The LTD policy— a plan governed by ERISA—imposes the contractual duties allegedly breached by Liberty.  *Id.*  Next, Plaintiff's claims for common law and statutory bad faith cannot stand independent of the ERISA plan because interpretation of the LTD policy is an essential aspect of those claims.  *Id.* at *5–6.  Finally, Plaintiff's claim for negligence per se based on Liberty's alleged reliance on the opinions of unlicensed physicians in denying benefits also derives from the rights and

-18-

obligations established under the LTD policy.  *Id.* at *6; *Hogan*, 2013 WL 5425303, at *4. Though Plaintiff asserts violations of Kentucky's medical licensing statutes, the purported duty only arises, in this instance, because of Liberty's role in reviewing the claim for LTD benefits under the ERISA plan.  *Hanshaw*, 2014 WL 5439253, at *6; *Hogan*, 2013 WL 5425303, at *4.

The Court concludes that § 1132(a)(1)(B) of ERISA completely preempts Plaintiff's asserted state law claims, permitting the exercise of federal question jurisdiction.  Liberty properly removed this action from state court, and Plaintiff's motion to remand (DN 8) will be denied.

## IV.    CONCLUSION

For the reasons stated above, the Court will deny Plaintiff's motion to remand (DN 8) and her motion for a hearing and oral argument (DN 43), and it will grant Liberty's motion for leave to file a surreply (DN 39).  A separate order will be entered this date in accordance with this Memorandum Opinion.

April 30, 2015

**Charles R. Simpson III, Senior Judge**
**United States District Court**